# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**BRIDGETTE COMIC, Individually
and as Administratrix of the Estate
of KEYLAN G. COMIC**                                                                  **PLAINTIFF**

v.                               Case No.: 4:19-cv-00777-LPR

**WHITE COUNTY, ARKANSAS,** *et al.*                                            **DEFENDANTS**

## ORDER

This case stems from the suicide of a young man (Keylan Comic) in the White County Jail. Plaintiff Bridgette Comic is Mr. Comic's aunt and the administratrix of his estate. She brings claims under 42 U.S.C. § 1983 alleging deliberate indifference to serious medical needs and failure to train.[1] In addition, she brings a wrongful death claim under state law.[2] Pending before the Court is a Motion for Summary Judgment by all Defendants.[3] For the reasons discussed below, the Court GRANTS summary judgment to Defendants.[4]

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[5] If the moving party makes such a showing, the non-moving party must then present "specific facts, by affidavit,

---

[1] Pl.'s Second Am. Compl. (Doc. 3).

[2] *Id.*

[3] Defs.' Mot. for Summ. J. (Doc. 18).

[4] In addition to the named Defendants, Plaintiff also sued four unnamed defendants: John Doe I, John Doe II, Jane Doe I, and Jane Doe II. Pl.'s Second Am. Compl. (Doc. 3) at ¶¶ 14–15. The named Defendants argue that these Doe Defendants should be dismissed because Plaintiff "has not complied with the John Doe statute, substituted real persons in place of the 'John Does,' and/or served any of them with the Complaint." Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 19) at 1 n.1. Plaintiff does not respond to Defendants' argument and makes no mention of the unnamed Defendants in her briefing. The Court agrees with the named Defendants.

[5] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)(2)).

deposition, or otherwise, showing the existence of a genuine issue for trial" to avoid summary judgment.[6]

Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[7] The dispute of fact must instead be both genuine and material to prevent summary judgment.[8] Whether there is a material dispute of fact "rests on substantive law," because "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."[9] A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[10]

The Court must view the genuinely disputed material facts in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences. As to the undisputed facts, the Court can of course rely on those for summary judgment. Accordingly, the most pro-plaintiff version of the record that a rational juror could find to have occurred will be considered here.[11]

**FACTS**

On September 13, 2016, officers from the White County Sheriff's Department arrested Keylan Comic and booked him into White County Jail on charges of armed robbery.[12] While incarcerated, Mr. Comic was placed on suicide watch on several occasions.[13] The medical team at Advanced Correctional Healthcare (ACH), a third party medical contractor that the County hired

---

[6] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[7] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[8] *Torgerson*, 643 F.3d at 1042.

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10] *Id.*

[11] *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

[12] Pl.'s Resp. to Statement of Facts (Doc. 24) at 2; Ex. A to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[13] Pl.'s Resp. to Statement of Facts (Doc. 24) at 2, 4–5.

to provide detainees with medical care, administered the medical care that Mr. Comic received as a result of his suicide attempts.[14]  No medical personnel from ACH (or any other healthcare entity) have been sued in this case.

On September 14, 2016, Mr. Comic attempted to commit suicide by choking himself with a piece of cloth and trying to slit his throat with a piece of plastic.[15]  As a result, Mr. Comic was placed on suicide watch.[16]  Per White County Jail's policies and procedures, an incident report was created detailing Mr. Comic's suicide attempt, and this report was placed in Mr. Comic's file.[17]

On September 16, 2016, while on suicide watch, Mr. Comic was seen by a nurse who reported that Mr. Comic was suicidal.[18]  That same day, Ms. Madonna Wallace, a licensed professional counselor, conducted a mental health assessment of Mr. Comic.[19]  It is not clear from the record whether Ms. Wallace is part of the ACH medical team or some other medical consultant. Ms. Wallace concluded that Mr. Comic was suicidal.[20]  Mr. Comic told Ms. Wallace that he wanted to hurt himself because he was angry, he has nightmares that prevent him from sleeping, he has attempted suicide in the past by cutting himself, and he had been admitted to several mental institutions.[21]

---

[14] *Id.* at 12; *see also* Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 19) at 10.

[15] Pl.'s Resp. to Statement of Facts (Doc. 24) at 2; Ex. B to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[16] Pl.'s Resp. to Statement of Facts (Doc. 24) at 2; Ex. B to Pl.'s Resp. to Statement of Facts (Doc. 24-1).  Per White County Jail's policies and procedures, the jail staff must check inmates who are on suicide watch every 15 minutes at a minimum.  Ex. C to Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 25-1) at 53.

[17] Pl.'s Resp. to Statement of Facts (Doc. 24) at 2; Ex. C to Pl.'s Resp. to Statement of Facts (Doc. 24-1).  White County Jail maintained a file for Mr. Comic that contained his jail and medical records including records related to his suicide attempts.  Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 14 (citing Ex. C to Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 25-1)).

[18] Pl.'s Resp. to Statement of Facts (Doc. 24) at 3; Ex. D to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[19] Pl.'s Resp. to Statement of Facts (Doc. 24) at 3; Ex. E to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[20] Pl.'s Resp. to Statement of Facts (Doc. 24) at 3; Ex. F to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[21] Pl.'s Resp. to Statement of Facts (Doc. 24) at 3; Ex. G to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

Ms. Wallace filled out an "HRA Crisis Intervention Assessment and Plan."[22] On this form, there is a box titled, "Recommendations/Disposition/Comments: Include others interviewed: family, friends, consultation w/ supervisor or other provider."[23] In this box, Ms. Wallace wrote: "MHP recommends hospitalization for stabilization and to assure safety [with] appropriate medication prescribed and given when he is returned to jail and linking to appropriate OP mental health [treatment]."[24] Mr. Comic was not hospitalized. Instead, a week later, the ACH medical team released Mr. Comic from suicide watch on September 23, 2016.[25] The record does not contain any information regarding who made the decision not to adopt Ms. Wallace's hospitalization recommendation. The record also does not contain any information regarding who saw or knew about this recommendation.

On September 27, 2016, four days after being released from suicide watch, Mr. Comic made another suicide attempt by using a plastic ID card to cut his throat while in a police squad car.[26] He was placed on suicide watch.[27] Mr. J. Earl Mansur, another licensed professional counselor, conducted a second mental health assessment of Mr. Comic on September 28, 2016.[28] Mr. Comic told Mr. Mansur that he feels like hurting himself and those who are around him, he

---

[22] Ex. G to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[23] *Id.*

[24] *Id.*

[25] Ex. O to Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 25-1). Defendants maintain that the ACH medical team made all decisions related to whether and when to release a detainee from suicide watch. Pl.'s Resp. to Statement of Facts (Doc. 24) at 12. Plaintiff responds that "[a]lthough White County contracted with Advanced Correctional Healthcare to provide medical care, it refused to follow the advice of the mental health professionals to place Keylan in a mental hospital." *Id.* Plaintiff does not dispute that ACH administered the medial care that Mr. Comic received in response to his suicide attempts, or that ACH was the entity with the power to release Mr. Comic from suicide watch.

[26] Pl.'s Resp. to Statement of Facts (Doc. 24) at 4; Ex. H to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[27] The record is unclear as to the exact timeline of when Mr. Comic went on and off suicide watch as a result of his September 27 suicide attempt. Based on the record and Ms. Comic's counsel's explanation at the motion hearing, the Court infers that Mr. Comic was placed on suicide watch after his September 27 suicide attempt and was taken off suicide watch sometime before October 22, 2016. September 3, 2021, Hr'g Tr. at 22–24.

[28] Pl.'s Resp. to Statement of Facts (Doc. 24) at 4; Ex. H to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

thinks people are watching him and standing over him, he feels bad because he's done bad things, there's nothing good about him or in his life, and he had been a patient at mental institutions in the past.[29] Mr. Mansur noted all of this in his report.[30]

Based on his assessment, Mr. Mansur filled out an "HRA Crisis Intervention Assessment and Plan."[31] On this form, there is a box titled, "Recommendations/Disposition/Comments: Include others interviewed: family, friends, consultation w/ supervisor or other provider."[32] In this box, Mr. Mansur wrote: "Due to [his] highly excitable mood and visible wounds on [his] throat which he self inflicted yesterday while in police custody in [a] suicide attempt, and due to Mr. Comic's inability to self calm, I recommend referral to inpatient psych today."[33] If such a transfer was not permitted, Mr. Mansur recommended Mr. Comic be given psychotropics, be denied access to any possible weapon that he could use against himself, and be afforded the chaplain services.[34] The record does not contain any information regarding who made the decision not to adopt Ms. Mansur's recommendation that Mr. Comic be referred to inpatient psych. The record also does not contain any information regarding who saw or knew about this recommendation.

On September 29, 2016, a nurse saw Mr. Comic and recommended that he remain on suicide watch.[35] At some point thereafter (although it is not clear when), ACH released Mr. Comic from suicide watch.[36] On October 22, 2016, Mr. Comic was upset because it was time for his hour

---

[29] Ex. H to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 5; Ex. P to Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 25-1).

[36] September 3, 2021, Hr'g Tr. at 23–24; *see supra* note 27.

outside of his cell and he hadn't been allowed out yet.[37] After he was told to calm down, Mr. Comic tried to cut his neck with a spork.[38] As a result, Mr. Comic was again placed on suicide watch.[39] Sergeant McCormack, one of the Defendants in this case, was the "Officer in Charge" on that day; it is not clear from the record how involved she was with this incident.[40]

On October 24, 2016, a nurse saw Mr. Comic and she noted that he told her "I want to leave, I want to die" and she recommended that he stay on suicide watch.[41] A week later, on October 31, 2016, the medical team at ACH took Mr. Comic off suicide watch.[42]

Mr. Comic's suicide took place on November 5, 2016.[43] That day, Mr. Comic had two episodes in the central area of his pod where he was acting out and refusing to return to his cell.[44] The first time, Sergeant McCormack and Deputy Pritchard returned Mr. Comic to his cell, which required the officers to draw their tasers.[45] The second time, Sergeant McCormack called for backup.[46] The officers who responded to the scene are Defendants in this case: Deputies Addington, Howard, Crow, and Pritchard.[47] According to Deputy Addington's narrative, Sergeant McCormack called for backup due to Mr. Comic's "combative behavior and previous incidents of violent outbursts."[48] According to Crow's narrative, Sergeant McCormack called for backup due

---

[37] Pl.'s Resp. to Statement of Facts (Doc. 24) at 5; Ex. I to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[38] Pl.'s Resp. to Statement of Facts (Doc. 24) at 5; Ex. I to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[39] Pl.'s Resp. to Statement of Facts (Doc. 24) at 5; Ex. I to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[40] Pl.'s Resp. to Statement of Facts (Doc. 24) at 5; Ex. I to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[41] Pl.'s Resp. to Statement of Facts (Doc. 24) at 5; Ex. J to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[42] Pl.'s Resp. to Statement of Facts (Doc. 24) at 5; Ex. K to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[43] Pl.'s Resp. to Statement of Facts (Doc. 24) at 10.

[44] Pl.'s Resp. to Statement of Facts (Doc. 24) at 8; Ex. O-2 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[45] Pl.'s Resp. to Statement of Facts (Doc. 24) at 8; Ex. 3 to Def.'s Statement of Facts (Doc. 20-3); Ex. 7 to Def.'s Statement of Facts (Doc. 20-7).

[46] Pl.'s Resp. to Statement of Facts (Doc. 24) at 9; Ex. L to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[47] Pl.'s Resp. to Statement of Facts (Doc. 24) at 8–9.

[48] Ex. L to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

to "prior incidents in the past with [Mr. Comic] becoming violent and refusing to cooperate with Detention Center staff."[49]  This was the first time that Deputies Addington, Crow, and Howard met and interacted with Mr. Comic.[50]  These officers were told that Mr. Comic was angry, out of control, combative, and had a blanket around his chest and back area to allegedly avoid being tased.[51]  Nothing was said to the officers about Mr. Comic's past suicide attempts.[52]

    Shortly after 2:09 p.m., the Deputies removed Mr. Comic from the pod and placed him in an isolation cell.[53]  Because Mr. Comic was aggressively resisting the Deputies' efforts to move him, the officers resorted to cuffing Mr. Comic's hands and feet to prevent him from kicking and biting them.[54]  Once the officers delivered Mr. Comic to the isolation cell, Mr. Comic covered the camera lens in the cell; this occurred at 2:23:53 p.m.[55]  Mr. Comic subsequently asked Officer Brackenridge (not a Defendant in this case) for the return of his shoes and blanket, but she told him he had to uncover his camera lens before she would listen to his request.[56]  Mr. Comic agreed and he briefly uncovered the lens at 2:46:45 p.m.[57]  After their conversation, Mr. Comic once again covered the lens at 2:47:19 p.m.[58]  The shoes and blanket were delivered to Mr. Comic.[59]  The record is silent as to the time of delivery and as to the person who delivered the items.

---

[49] *Id.*

[50] Ex. 5 to Defs.' Statement of Facts (Doc. 20-5) ¶ 1; Ex. 6 to Defs.' Statement of Facts (Doc. 20-6) ¶ 1; Ex. 8 to Defs.' Statement of Facts (Doc. 20-8) ¶ 1.  Ms. Comic does not dispute this.

[51] Ex. L to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[52] Ex. 5 to Defs.' Statement of Facts (Doc. 20-5) ¶ 2; Ex. 6 to Defs.' Statement of Facts (Doc. 20-6) ¶ 2; Ex. 8 to Defs.' Statement of Facts (Doc. 20-8) ¶ 2.  Ms. Comic does not dispute this.

[53] Ex. L to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[54] *Id.*

[55] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. N to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[56] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[57] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[58] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[59] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

Officer Brackenridge called Sergeant McCormack to inform her that Mr. Comic had covered the lens for the second time.[60]  In response, Sergeant McCormack told Officer Brackenridge not to worry about it because Mr. Comic would calm down after he cooled off and that this was Mr. Comic's "normal and routine behavior."[61]  Tragically, Mr. Comic did not calm down.  Deputy Pritchard found Mr. Comic hanged in his cell at 4:15 p.m. when officers were placing another inmate in a nearby cell.[62]  Deputy Pritchard, along with a number of jailers, patrol staff, and EMS crew, administered emergency aid from the moment Mr. Comic was discovered until he left the jail in an ambulance.[63]

Ms. Comic brought this lawsuit against several defendants. The foregoing facts explain the involvement of each of the Defendants except for Sheriff Miller, Former-Sheriff Shourd, and Captain Edwards.  Defendants maintain that at no point during Mr. Comic's incarceration did Sheriff Miller, Former-Sheriff Shourd, or Captain Edwards meet or interact with Mr. Comic.[64]  Ms. Comic does not dispute this.

## DISCUSSION

No rational juror could conclude that the Defendants named in this lawsuit violated Mr. Comic's Fourteenth Amendment right to due process.  So, Defendants are entitled to summary judgment.

---

[60] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[61] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[62] Pl.'s Resp. to Statement of Facts (Doc. 24) at 6; Ex. O-1 to Pl.'s Resp. to Statement of Facts (Doc. 24-1).

[63] Pl.'s Resp. to Statement of Facts (Doc. 24) at 10.

[64] Ex. 1 to Defs.' Statement of Facts (Doc. 20-1) ¶ 4; Ex. 2 to Defs.' Statement of Facts (Doc. 20-2) ¶ 4; Ex. 4 to Defs.' Statement of Facts (Doc. 20-4) ¶ 3.

### I. Individual Capacity Claims

Plaintiff asserts that Former-Sheriff Shourd, Captain Edwards, Sergeant McCormack, and Deputies Crow, Howard, Addington, and Pritchard, in their individual capacities, violated Mr. Comic's Fourteenth Amendment rights and are therefore liable under 42 U.S.C. § 1983. Defendants argue that they're entitled to qualified immunity and thus summary judgment is appropriate as a matter of law.

To get past qualified immunity, a plaintiff must show (1) a violation of a constitutional or statutory right, and (2) that the right was clearly established at the time of the violation.[65] "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law."[66] "But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment."[67]

The Fourteenth Amendment protects pretrial detainees[68] from officials' "deliberate indifference" to their "serious medical needs."[69] It's well established in the Eighth Circuit "that a risk of suicide by an inmate is a serious medical need."[70] To be held liable for deliberate indifference, "plaintiffs must prove [Defendants] held actual knowledge that [the inmate] was at substantial risk of serious harm but failed to take reasonable action in response to that known risk."[71] So, in the context of inmate suicide, "[a] prison official is not liable under the Fourteenth

---

[65] *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000).

[66] *Greiner v. City of Champlin*, 27 F.3d 1346, 1352 (8th Cir 1994).

[67] *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999) (internal quotation marks and citation omitted).

[68] A pretrial detainee's § 1983 claims are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's prohibition of cruel and unusual punishment. *See Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019) (stating "[a]s a pretrial detainee, [the inmate] is entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment" (internal quotation marks and citation omitted)); *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (same).

[69] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[70] *Gregoire*, 236 F.3d at 417 (citing *Rellergert by Rellergert v. Cape Girardeau Cnty.*, 924 F.2d 794 (8th Cir. 1991)).

[71] *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 829 (1994)).

Amendment unless the official knows of facts evidencing a substantial suicide risk *and* the official actually infers the prisoner presents a substantial suicide risk."[72]  "The Supreme Court has likened deliberate indifference to a criminal recklessness standard, which traditionally has contained a subjective component."[73]  Recklessness is "more than negligence, more even than gross negligence."[74]  Needless to say, deliberate indifference is a rigorous standard and one that "is a difficult burden for a plaintiff to meet."[75]

### A. Former-Sheriff Shourd & Captain Edwards

To determine whether Former-Sheriff Shourd and Captain Edwards were deliberately indifferent to Mr. Comic's medical needs, the Court must first determine whether they knew about Mr. Comic's suicide risk.  Former-Sheriff Shourd and Captain Edwards had no personal involvement with Mr. Comic during his incarceration.  There is nothing in the record to suggest that these officers knew anything at all about Mr. Comic.  Ms. Comic argues that they should have been aware of Mr. Comic's previous suicide attempts because Mr. Comic's jail file had records documenting those attempts.  However, Ms. Comic points to no evidence that shows Captain Edwards or Former-Sheriff Shourd ever actually read the contents of Mr. Comic's file or that they were under any obligation per jail policy to review inmates' files.

In short, Ms. Comic failed to provide any evidence that Former-Sheriff Shourd or Captain Edwards had any knowledge—much less the level of actual knowledge required to constitute deliberate indifference—of Mr. Comic's suicidal ideations.  Given this, the Court finds that

---

[72] *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003) (emphasis in the original).

[73] *Gregoire*, 236 F.3d at 417.

[74] *Johnson*, 929 F.3d at 575 (internal quotation marks and citation omitted).

[75] *Rellergert*, 924 F.2d at 796 (internal quotation marks and citations omitted);  *see also Yellow Horse v. Pennington Cnty.*, 225 F.3d 923, 928 (8th Cir. 2000) (holding that an officer on duty at the time of an inmate's suicide, who had been recently taken off suicide watch, was not deliberately indifferent for failing to make more timely cell checks even though the inmate was acting out and upset).

Former-Sheriff Shourd and Captain Edwards could not possibly have violated Mr. Comic's constitutional rights and are thus entitled to qualified immunity and summary judgment.[76]

### B. Deputies Crow, Howard, & Addington

On the day Mr. Comic died, Deputies Crow, Howard, and Addington removed Mr. Comic from his pod and placed him in an isolation cell after he refused to return to his original cell. This was the first time Deputies Crow, Howard, and Addington met and interacted with Mr. Comic. Before the Deputies approached Mr. Comic, Sergeant McCormack warned them that Mr. Comic had behaved badly earlier in the day.[77] But nothing in the record indicates that she mentioned Mr. Comic's suicide attempts to the Deputies. Deputies Crow, Howard, and Addington stated that they did not observe or hear anything from Mr. Comic or anyone else about his suicidal tendencies. Ms. Comic does not present any facts showing or suggesting that Deputies Crow, Howard, and Addington had any knowledge about Mr. Comic's suicide attempts. Further, the record has no evidence that Mr. Comic said anything to the Deputies to inform them that he was suicidal when they transferred him to the isolation cell.

Plaintiff's argument is that a juror could infer these officers knew about the prior suicide attempts because that information was in Mr. Comic's jail file. But she cites no policy that requires officers to review inmates' files, and she cites no evidence that Deputies Crow, Howard, and Addington ever actually read Mr. Comic's file. In short, no rational juror could conclude that the Deputies had any reason to believe that Mr. Comic was suicidal. Because they had no knowledge

---

[76] To be fair to Ms. Comic, it is not clear that she was or is trying to press a constitutional deliberate indifference claim against Former-Sheriff Shourd and Captain Edwards. Her complaint, especially in light of her counsel's argument at the motion hearing, could be read as limiting the claim against Former-Sheriff Shourd and Captain Edwards to the claim for failure to train. Pl.'s Second Am. Compl. (Doc. 3) at ¶ 79. The claim for failure to train is analyzed below in Section II.

[77] Stretching the record as far as humanly possible, one might be able to say that Sergeant McCormack's warning of Mr. Comic's prior bad behavior included telling the officers that Mr. Comic had misbehaved on other days as well.

11

of Mr. Comic's suicide risk, Deputies Crow, Howard, and Addington could not have violated Mr. Comic's constitutional rights and are thus entitled to qualified immunity and summary judgment.

## C. Sergeant McCormack & Deputy Pritchard

For Sergeant McCormack and Deputy Pritchard, the deliberate indifference question is at least a little closer. The Eighth Circuit has noted "that deliberate indifference claims against prison officials in inmate suicide cases have arisen under two factual circumstances": (1) when "the jailers allegedly failed to discover the inmate's suicidal tendencies;" and (2) when "jailers knew about suicidal tendencies but allegedly failed to take reasonable preventative measures."[78] Because Defendants concede that Sergeant McCormack and Deputy Pritchard knew that Mr. Comic had been on suicide watch in the past,[79] "the question is only whether the [preventative] measures taken were so inadequate as to be deliberately indifferent to the risk. The suicide is not probative of that question."[80]

With respect to Sergeant McCormack, Ms. Comic argues that Sergeant McCormack's failure to check on Mr. Comic (at short intervals) after he covered the camera lens in his isolation cell, despite her awareness of Mr. Comic's past suicide attempts, shows that she was deliberately indifferent to Mr. Comic's suicide risk. With respect to Deputy Pritchard, Ms. Comic makes no argument explaining how her conduct was deliberately indifferent to Mr. Comic's suicide risk except to say that she was aware of Mr. Comic's past suicide attempts. The Court assumes that Ms. Comic is arguing that Deputy Pritchard (like Sergeant McCormack) was deliberately indifferent for failing to check on Mr. Comic. Essentially, Ms. Comic is saying these two officers were deliberately indifferent for failing to put Mr. Comic back on suicide watch (or at least

---

[78] *Olson v. Bloomberg*, 339 F.3d 730, 735 n.6 (8th Cir. 2003).

[79] Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 19) at 10.

[80] *Rellergert*, 924 F.2d at 796.

12

checking on him every fifteen minutes as if he were on suicide watch) after they witnessed his bad behavior on the day that he died.

No rational juror could conclude on this record that either Sergeant McCormack or Deputy Pritchard failed to take reasonable preventative measures to abate a known suicide risk. Here's why. Six days before Mr. Comic died, the ACH medical team had taken Mr. Comic off suicide watch. In the intervening six days, Mr. Comic had not attempted suicide. On the day in question, Mr. Comic had more than one instance of bad behavior. Twice, Mr. Comic refused to leave his pod's common area and return to his cell. Officers had to use coercion, including drawing their tasers, to transport him back to his original cell. That first incident did not result in a suicide attempt. Moreover, Mr. Comic did not make any suicide threats or suggestions during that first incident. Given Mr. Comic's behavior that day, it was not unreasonable (much less reckless) for Sergeant McCormack and Deputy Pritchard to conclude that the second outburst would similarly not lead to a suicide attempt.

During that second outburst, Mr. Comic made no suicide threat or suggestion. All of Mr. Comic's previous suicide attempts involved physical acts of self-harm. At no time during his first or second outburst did Mr. Comic say or do anything to suggest that he was going to commit suicide. The record contains no evidence to show that Mr. Comic was still experiencing suicidal thoughts or had an intent to harm himself. At bottom, there is nothing to show that Sergeant McCormack and Deputy Pritchard had any reason to believe that Mr. Comic was likely to attempt suicide or needed to be placed on suicide watch or treated as if he were on suicide watch. Not every incident of bad behavior by an inmate with a history of suicide attempts automatically triggers the need for a suicide watch.

It's true that the officers knew of Mr. Comic's past suicide attempts.  It's true that Mr. Comic covered the lens on the camera in his isolation cell.  It's true that he had behaved badly on that day.  It's true that he asked for a blanket and shoes.  It's true that Sergeant McCormack told Officer Brackenridge not to worry about Mr. Comic after he covered the camera lens.  A rational juror could certainly find that this adds up to a mistake on the parts of Sergeant McCormack and Deputy Pritchard.  A rational juror could even find that this constitutes negligence or gross negligence.  But a rational juror could not find recklessness.  There is no evidence to allow a rational juror to conclude that the officers had a subjective belief that Mr. Comic might commit suicide after the second incident.  The Court therefore concludes that Sergeant McCormack and Deputy Pritchard are entitled to qualified immunity and grants them summary judgment.[81]

Even if a rational juror could conclude that Deputy Pritchard and Sergeant McCormack were deliberately indifferent to Mr. Comic's risk for suicide, the Court would still grant summary judgment to them based on the second prong of the qualified immunity test.[82]  Under Supreme Court precedent, a right is clearly established when "[t]he contours of [a] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates that

---

[81] Plaintiff cites *Olson* to support her argument that qualified immunity should be denied.  339 F.3d at 735, 738.  In *Olson*, the Eighth Circuit held that there were genuine issues of fact as to whether an officer was deliberately indifferent to an inmate's suicide risk after the inmate told him that he was going to commit suicide and did so.  *Id.* at 738.  *Olson* and the case at bar are distinguishable. Most significantly in *Olson*, "there was direct, first-hand communication from [the inmate] to [officer] of [the inmate's] intent to commit suicide and the method by which [the inmate] intended to carry out his threat."  *Id.* at 736.  Moreover, the officer in *Olson* "knew it was an immediate threat, and saw that [the inmate] had selected a method and had equipment at hand."  *Id.*  736–37.  Because there was conflicting evidence about what measures the officer took to prevent the inmate's suicide after he became aware of the threat, the court denied him summary judgment.  *Id.* at 735, 738.  Here, unlike the officer in *Olson*, Sergeant McCormack and Deputy Pritchard had no first-hand knowledge that Mr. Comic was experiencing suicidal thoughts on the day that he died.  Given that ACH's medical team took Mr. Comic off suicide watch and the fact that Mr. Comic said nothing and did nothing to indicate that he was feeling suicidal on the day in question, Defendants had no reason to believe that Mr. Comic should be placed on suicide watch or treated as if he were on suicide watch or that special preventative measures were otherwise necessary.

[82] *Barton v. Taber*, 908 F.3d 1119, 1123 (8th Cir. 2018).

right."[83]  To show this, "[a] plaintiff need not cite a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must have put the statutory or constitutional question beyond debate as of the date of the alleged violation."[84]

While it may be clearly established that the Fourteenth Amendment protects pretrial detainees from officials' deliberate indifference to their serious medical needs, the Eighth Circuit requires the Court to "examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law."[85]  In the qualified immunity context, "'[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established.'"[86]  The officer's exact conduct need not have been deemed unconstitutional at the time it occurred, but "in light of preexisting law[,] the unlawfulness must be apparent."[87]

Here, Ms. Comic cites no caselaw (precedential or otherwise) that is analogous enough to the instant case to have put Sergeant McCormack and Deputy Pritchard on notice that their actions violated clearly established law.  Nor has the Court found any such caselaw.  And the general principle established by the suicide risk cases (*see supra* at 9–10 & 12) doesn't clearly extend to the instant circumstances.  Obviously, had Mr. Comic expressed suicidal thoughts or had the officers witnessed him trying to harm himself that day, they would have needed to respond accordingly (for example, by placing him on suicide watch).  However, given that Mr. Comic said

---

[83] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (brackets in original) (internal quotations marks and citation omitted).

[84] *Hamner v. Burls*, 937 F.3d 1171, 1176 (8th Cir. 2019) (internal quotation marks and citations omitted).

[85] *Langford v. Norris*, 614 F.3d 445, 461 (8th Cir. 2010) (internal quotation marks and citation omitted).

[86] *Hamner*, 937 F.3d at 1178 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)) (emphasis in the original) (brackets in the original).

[87] *Langford*, 614 F.3d at 461 (internal quotation marks and citation omitted).

nothing and did nothing on the day in question (and for multiples days before that) to indicate that he intended to harm himself, the officers were not reckless in relying on ACH's six-day-old determination that he was no longer at risk for suicide and therefore the officers were not reckless in failing to take any additional, special preventative measures. There is no case that makes clear that Mr. Comic's bad behavior on the day in question required the officers to put him on suicide watch or treat him as if he were on suicide watch. There is no case that makes clear that his behavior (which did not include suicidal talk or conduct) somehow triggered a renewed need for suicide watch.

The Court finds that Sergeant McCormack and Deputy Pritchard are entitled to qualified immunity, as this doctrine "permit[s] liability only for transgressions of bright lines, not for violations that fall into gray areas."[88] It was not clearly established at the time of Mr. Comic's death or even today that the conduct of these officers violated the Fourteenth Amendment.

## II. Official Capacity Claims (including the claims against White County)[89]

Everyone agrees here that there was no official policy, plan, or custom that caused the alleged constitutional violation.[90] Accordingly, the official capacity claims for deliberate indifference are out.[91] At the motion hearing, Ms. Comic's counsel stated that the official capacity claims were better conceptualized as claims for failure to train.[92] "[T]he inadequacy of policy

---

[88] *Perry*, 993 F.3d at 587 (internal quotation marks and citation omitted).

[89] *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)) ("A suit against a government official in his or her capacity is 'another way of pleading an action against an entity of which an officer is an agent.'").

[90] *Luckert v. Dodge Cnty.*, 684 F.3d 808, 820 (8th Cir. 2012) (quoting *Johnson v. Blaukat*, 453 F.3d 1108, 1114 (8th Cir. 2006)) ("A claim against a county is sustainable only where a constitutional violation has been committed pursuant to an official custom, policy, or practice.").

[91] Ms. Comic sued Sheriff Miller in his official capacity only. Pl.'s Second Am. Compl. (Doc. 3) at 1 (see caption). All claims against Sheriff Miller, like all official capacity claims against the other Defendants, are out.

[92] September 3, 2021, Hr'g Tr. at 34.

training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[93] The Supreme Court has also indicated that a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate indifference for purposes of failure to train."[94] Ms. Comic's counsel explained at the motion hearing that the theory underlying Ms. Comic's claims is that the officers were not trained to handle Mr. Comic's mental health problems, and this failure to train amounts to deliberate indifference.[95] When asked by the Court whether he could point to any evidence to support this theory, Ms. Comic's counsel conceded that these claims are "kinda sketchy" and he offered no record citations to support his argument.[96] This is not surprising. The record contains no evidence to support these claims. Given Ms. Comic's counsel's concession and the lack of any evidence in the record showing that any Defendant failed to train officers on suicide risk and prevention, the Court concludes that a rational juror could not find for Ms. Comic on these claims and therefore Defendants are entitled to summary judgment.[97]

### III. Wrongful Death Liability

Ms. Comic also alleged wrongful death by means of deliberate indifference.[98] At the motion hearing, Ms. Comic's counsel explained that Plaintiff's wrongful death claim stands or falls with her deliberate indifference claim.[99] Because the Court concludes that Ms. Comic's

---

[93] *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

[94] *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks and citation omitted).

[95] September 3, 2021, Hr'g Tr. at 34.

[96] *Id.*

[97] In any event, because no rational juror could find that Defendants were deliberately indifferent, Plaintiff's official capacity claims necessarily fail as they're derivative of her deliberate indifference claims.

[98] Pl.'s Second Am. Compl. (Doc. 3) at ¶¶ 84–88.

[99] September 3, 2021, Hr'g Tr. at 32–33.

deliberate indifference claim cannot survive summary judgment, Ms. Comic's wrongful death claim necessarily fails with it.[100]

## CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED in its entirety.

IT IS SO ORDERED this 29th day of September 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[100] The Eighth Circuit has held that a decedent's family member "may not shoehorn recovery available" under separate claims including a state law wrongful death claim "into the recovery she may receive under § 1983 for her [decedent's] injuries." *Andrews v. Neer*, 253 F.3d 1052, 1063–64 (8th Cir. 2001). Hence, even if the deliberate indifference claim survived here, summary judgment would still be appropriate for Plaintiff's wrongful death claims for damages for the decedent's family members under § 1983.